**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

| | |
|---|---|
| A.D. an individual, | |
| Plaintiff, | |
| vs. | Case No.: 2:22-cv-00645 |
| MARRIOTT INTERNATIONAL, INC.; and | COMPLAINT |
| CHM NAPLES II HOTEL PARTNERS, INC., | DEMAND FOR JURY TRIAL |
| Defendant(s). | |

## <u>COMPLAINT</u>

COMES NOW the Plaintiff A.D. ("Plaintiff" or "A.D."), by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## <u>INTRODUCTION</u>

1.    For decades, criminal sex traffickers have brazenly operated in and out of hotels throughout this country. Victims of sex trafficking are taken to hotel and motel rooms to be repeatedly trafficked, sexually assaulted, demeaned and left with multiple unaddressed injuries, while hotel operators and hospitality giants pay lip service to campaigns against sex trafficking, turning a blind eye to criminal misconduct and collecting profits from the criminal misconduct at the expense of

human life, human rights, and human dignity.

2.      All Defendants know and have known for decades that sex trafficking repeatedly occurs at their respective locations and under their flags throughout the country. Rather than taking timely and effective measures to thwart this epidemic, Defendants have instead chosen to ignore and thereby facilitate commercial sex trafficking on their properties, enjoying the monetary profit and other benefits stemming from rooms rented for the purpose of sex trafficking, while making no attempt to raise awareness or put an end to the repeated abuses of victims at their properties.

3.      This action for damages is brought by the Plaintiff, a survivor of sex trafficking hereinafter identified by her initials A.D., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA").

4.      A.D. was trafficked for commercial sex in Collier County in Florida.  A.D. was sold via commercial sex transactions at the Defendants' hotel property, where force, fraud, and coercion were used against her, while Defendants turned a blind eye and continued to benefit.

5.      A.D. was advertised for sex on various websites known for trafficking, whereby Defendants provided open access to these known websites permitting traffickers and buyers to enable, facilitate, and otherwise assist in the harboring of

A.D. for the purpose of sex trafficking.

6.    Upon information and belief, these websites were repeatedly used by the trafficker to control and arrange for A.D. to be sold repeatedly to buyers who frequented the Defendants' hotel property to purchase victims of sex trafficking, including A.D.

7.    With knowledge of the problem, and as a direct and proximate result of Defendants' multiple failures to act, mandate, establish, execute, and/or modify their anti-trafficking efforts on their hotel property, A.D. was sex trafficked, sexually exploited, and victimized repeatedly at Defendants' hotel.

8.    The Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595, against the Defendants who, motivated by profits and the value of the "good will" of their brand, refused to institute meaningful steps to stop trafficking, and instead continued to operate a venture which enabled, harbored, held, facilitated, or any combination of the foregoing, the repeated and continuous trafficking, exploitation, and victimization of A.D. for their own benefit.

9.    The Plaintiff brings this action for damages against the Defendants listed herein for knowingly benefiting from facilitating a venture that they knew, or should have known, to be in violation of the TVPRA.  Defendants turned a blind-eye to more than a decade of direct knowledge regarding anti-trafficking efforts

and failed in their mandated and assumed duties to protect Plaintiff and others from sex trafficking.

## PARTIES

10.    Plaintiff A.D. is a natural person who resides in Collier County, Florida.

    a.  Plaintiff A.D. was living at home with her parents, fully employed and enrolled in college when she was first beckoned to a hotel where she was fraudulently induced, coerced and sexually assaulted before being sold for the purposes of commercial sex throughout Hillsborough, Collier, and Lee Counties. The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (17) and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (16).

    b.  Due to the sensitive, private, and potentially retaliatory nature of the allegations, this Court has granted Plaintiff A.D.'s request to proceed under a pseudonym to ensure Defendants keep Plaintiff's identity confidential throughout the pendency of the lawsuit thereafter.[1]

11.    Defendant Marriott International, Inc. ("Marriott") is one of the largest hotel franchising companies in the world with over 7,000 branded properties

---

[1] *A.D. v. CorePoint Lodging*, No. 2:22-cv-00095, ECF No. 159.

across 131 countries.[2]    Marriott offers public lodging services directly and through its affiliates, subsidiaries, and franchises.  In 2019, Marriott claimed to have "successfully trained 500,000 hotel workers to spot the signs of human trafficking in its hotels and how to respond if they do."[3]  Defendant Marriott is a Delaware corporation with its principal place of business located at 10400 Fernwood Road, Dept. 324.13, Bethesda, Maryland 20817.  It can be served by its registered agent at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

a. Marriott is the successor entity to Starwood Hotels and Resorts Worldwide, Inc. and retains successor liability for the wrongful acts of the predecessor.

b. As of 2016, Starwood Hotels and Resorts, LLC f/k/a Starwood Hotels and Resorts Worldwide, Inc. is a wholly owned subsidiary of Marriott.

c. Marriott owns, supervises, manages, controls, and/or operates the SpringHill Suites® by Marriott Naples ("SpringHill") located at

---

[2] We Are Marriott International, *A Brand Leader*,
https://www.marriott.com/marriott/aboutmarriott.mi (last visited Jul. 23, 2021).
[3] News Center, *Marriott International Has Trained 500,000 Hotel Workers to Recognize the Signs of Human Trafficking Wyndham Hotels & Resorts Reinforces Efforts to Combat Human Trafficking*, (Jan. 22, 2020) https://corporate.wyndhamhotels.com/news-releases/wyndham-hotels-resorts-reinforces-efforts-to-combat-human-trafficking/.

3798 White Lake Boulevard, Naples, Florida 34117 where A.D. was trafficked.

d.  Defendant Marriott conducts and operates business throughout the state of Florida.

e.  Marriott is subject to the jurisdiction of this Court because it regularly conducts business in the State of Florida; derives substantial revenue from services rendered in Florida, including through the operation of numerous hotels in Florida such as the SpringHill hotel; has caused indivisible injuries to A.D. in Florida; and profited from illegal commercial sex trafficking involving Plaintiff at its hotel.

f.  Marriott is the principal in an agency relationship with the SpringHill hotel.  In addition to Marriott's liability under TVPRA section 1595, Marriott is vicariously liable for the acts and/or omissions of the staff at its SpringHill hotel and all of its franchisee hotel.

g.  The SpringHill hotel where A.D. was trafficked has apparent agency for Marriott so as to establish vicarious liability under Florida law, in addition to an actual agency relationship.

h.  Marriott has ratified the actions and inactions of the SpringHill

hotel.

i.  Marriott exercises day-to-day control over the SpringHill hotel through its brand standards and retains control over the SpringHill hotel under the terms of its franchise agreement.

j.  Defendant Marriott and SpringHill Suites® are single and joint employers with a high degree of interrelated, intermingled, and unified operations at the SpringHill hotel where the Plaintiff was trafficked for sex. Defendant Marriott and SpringHill each share the common policies and practices complained of herein.

k.  Defendant Marriott and SpringHill jointly employ or ratify the employment of individuals through horizontal joint employment and/or vertical joint employment.

l.  As integrated enterprise and/or joint employers, Defendant Marriott and SpringHill are separately and jointly responsible for compliance with all applicable laws.

m. As integrated enterprise and/or joint employers, Defendant Marriott and SpringHill are jointly and severally liable for any damages caused by their employees.

n.  As the principal and as a hotel operator, Marriott controls the training, policies, and decisions on implementation and execution

of policy for its branded properties, including the SpringHill hotel where A.D. was trafficked.

o. Marriott represents that it considers guest safety and security important and requires the brand hotels in its portfolio to comply with Marriott brand standards and all local, state, and federal laws.[4]

p. Upon information and belief, Marriott also controls a uniform and required reservation and marketing system, credit processing system, and training and policy on brand standards, including policies on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Marriott, Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the SpringHill hotel where A.D. was trafficked.

---

[4] *See Marriott Int'l Inc. Human Rights Policy Statement* (July 2017), https://www.marriott.com/marriottassets/Multimedia/PDF/Corporate/HumanRightsStatement.pdf

q. Through Marriott's relationship with the staff at the SpringHill hotel where Plaintiff was trafficked and where traffickers of Plaintiff were guests or visitors, Marriott knowingly benefited, or received something of value, from its participation in a venture which it knew or should have known to violate the TVPRA through, *inter alia*, royalty payments, licensing fees, and percentages of the gross room revenue which Marriott is entitled to under the franchise agreements.

r. Marriott benefits financially from room rentals and other incidentals recognized through renting rooms at the brand property in which the Plaintiff was sex trafficked.

s. Marriott has benefited by turning a blind eye to rampant sex trafficking and claiming they have no control over the problem of prostitution and sex trafficking at their properties.

12.    Defendant CHM Naples II Hotel Partners, Inc. (hereinafter "CHM Naples"), doing business as the SpringHill Suites® by Marriott Naples ("SpringHill"), is a Delaware corporation and is one of Defendant Marriott's branded properties. Defendant CHM Naples was involved in the staffing and operation of the SpringHill Suites located at 3798 White Lake Boulevard, Naples, Florida 34117 where the Plaintiff was trafficked for sex. Through its relationship

with Defendant Marriott and the perpetrators who trafficked A.D. at the SpringHill Suites, Defendant CHM Naples knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had violated the TVPRA. Defendant CHM Naples may be served with service of process by serving its registered agent, National Registered Agents, Inc., at 1209 Orange Street, Wilmington, Delaware 19801.

13.    At all times relevant to this complaint Defendants Marriott International, Inc. and CHM Naples II Hotel Partners, Inc. ("Defendants") benefited from owning, managing, and operating the property where Plaintiff alleges injuries related to her sex trafficking occurred. The Defendants that act in unison and together are responsible for Plaintiff's injuries at the real property known as the SpringHill Suites® by Marriott Naples located at 3798 White Lake Boulevard, Naples, Florida 34117 is owned by CHM Naples II Hotel Partners, LLC.

14.    Defendant Marriott International, Inc. ("Marriott") may be referred to as the "Brand Hotel Defendant."

15.    Whenever reference is made in this Complaint to any act, deed, or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the

Defendants.

## JURISDICTION AND VENUE

16.    This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States and this Court has supplemental jurisdiction over Plaintiff's claims that do not arise under federal law because each claim is "so related to claims in the action within [this Court's] original jurisdiction that they form part of the same controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

17.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the judicial district where this action was brought.

## SEX TRAFFICKING UNDER FEDERAL LAW

18.    The requirements for liability under TVPRA § 1595 on a beneficiary theory can be stated as follows: (1) the person or entity must "knowingly benefit[], financially or by receiving anything of value," (2) from participating in a venture, (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

19.    Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or

soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion." This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

20.    To best understand the mechanism by which sex trafficking is prohibited by federal criminal law, it's best to address these elements in the reverse. Sex trafficking is slavery for the *purpose* of commercial sex, a lens on the already existing crimes prohibited by 18 U.S.C. § 1589 and §1590. The crime of slavery can then be divided into the two (2) elements remaining: the act and the means. The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. §1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

21.    Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, it is nevertheless a long- recognized and familiar atrocity.

## FACTUAL ALLEGATIONS

### A.  BRAND HOTELS CONTROL THE HOSPITALITY INDUSTRY

22.    Upon information and belief, between at least 2008 to 2012, Defendant Marriott held meetings among its executives, directors, and managers at which sex

trafficking in its hotels was discussed.

23.    Upon information and belief, between at least 2008 to 2012 the Brand Hotel Defendants held meetings through their trade organizations in which sex trafficking in their hotels was discussed.

24.    Upon information and belief, during at least 2008 to 2012, emails were exchanged by employees of Defendant's respective brand that related to sex trafficking in hotels, including Defendant's hotel.

25.    As industry leaders, Defendants each failed to articulate policy, process, or procedure that would measure the extent of the trafficking problem at their branded locations. They essentially all allowed their colleague brands to perpetuate the lie that sex trafficking was not a problem on their brand properties. Moreover, Defendants did not articulate a policy, process, or procedure that could measure whether the "employee training" had the effect of reducing instances or expected instances of human trafficking.

26.    Defendants collectively declined to implement policies that would likely have the effect of reducing the billions of dollars in sex trafficking profits. As a whole, Defendants did not call for stricter room rental requirements. For example, Defendants did not require ID or names of every person staying in the room; did not limit the number of people allowed to stay in a room; did not require a credit or debit card to be placed on file with a name on it (accepting prepaid credit cards

and even cash), and did not monitor reservation patterns maintained and owned by their brand central reservation systems, data of which could only be analyzed by the brand Defendant with backend access.  In short, Defendants refused to communicate to traffickers "your business and your money are not welcome here."

27.    Through this coordinated effort, Defendants were able to rest assured they would not have to implement effective policies and procedures. Given that human trafficking does more than $100 billion in business a year and the fact that a large percent of all sex trafficking occurs at hotels and motels—there can be no doubt that Defendants, as an industry, generate billions of dollars every year from human trafficking.

28.    Defendants' coordinated efforts created an industry standard of giving lip service to tackling human trafficking while in practice implementing nothing meaningful or effective. Defendants guaranteed that they would not have to compete with a national branded property that put together a policy that eliminated trafficking from their branded properties. While it would be challenging and expensive (both business expenses and lost revenues from traffickers) to implement effective policies, it is apparent that an effective policy would create a long term competitive advantage for the individual defendant. In short, a business that implemented an effective policy could easily provide

reportable data on how it reduced trafficking at its brand properties. Moreover, it could exploit the fact that other defendants are completely ignoring that a problem exists at their brand properties. The complying hotel could explain how other brand hotels will never be able to effectively battle the problem until they admit it exists on their properties. Thus, in the long run, an effective policy would generate public support and create brand loyalty, resulting in greater revenues and profits.

**B. THE DEFENDANTS' ACTUAL AND/OR CONSTRUCTIVE KNOWLEDGE OF SEX TRAFFICKING AT THEIR HOTEL**

29.    Defendants have been on notice of repeated incidences of sex trafficking occurring at their brand hotels, yet they failed to take the necessary action to meaningfully address sex trafficking and still persist in failing to take the necessary action to meaningfully address sex trafficking at their hotels.

30.    Several courts have found failure to implement policies sufficient to combat a known problem in one's operations can rise to the level of willful blindness or negligence.[5]

31.    Defendant Marriott had actual and/or constructive knowledge of sex trafficking, including A.D.'s sex trafficking and victimization, occurring on its branded property via the following:

    a.  Defendant Marriott owns, supervises, or operates the SpringHill

---

[5] *See Brown v. Corr. Corp. of Am.*, 603 F.Supp.2d 73, 81 (D.D.C. Mar. 26, 2009); *Trollinger v. Tyson Foods, Inc.*, 2007 WL 1574275, at *12 (.E.D. Tenn. May 29, 2007).

Suites® located at 3798 White Lake Boulevard, Naples, Florida 34117. Marriott failed to implement and enforce any of its own policy or policies and protect Plaintiff A.D. from being sex trafficked.

b.  Defendant Marriott voluntarily assumed the responsibility to implement sufficient policies to combat sex trafficking at its branded properties through its partnership with ECPAT, and its activities with the AHLA and other trade organizations. However, Marriott failed to implement its own policies and those recommended to it by the above mentioned advocacy organization which led to the inevitable consequence of continued trafficking at its branded properties, including the trafficking of A.D.[6]

c.  Upon information and belief, Plaintiff alleges that Marriott implemented means in which it could monitor various reviews of prostitution, trafficking, and guest safety issues.

d.  Defendant Marriott knew of sex trafficking occurring on its branded hotel properties. Marriott and SpringHill Suites® knew that sex trafficking and prostitution are associated, that both carry a high

---

[6] *See e.g.*, https://www.bakerdonelson.com/Franchisor-Liability-for-Franchisee-Actions-09-19-2011 (if a franchisor voluntarily assumes responsibility for some aspect of the franchise operations, it may be responsible if it is negligent in doing so).

risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Marriott and SpringHill Suites® knew that all of this violent and criminal activity was occurring at their branded properties therefore they knew that sex trafficking was occurring at their branded properties. Yet, Marriott and SpringHill Suites® allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the SpringHill Suites®. Specifically, Marriott and SpringHill Suites® facilitated the trafficking through its practices, policies, and procedures. Marriott and SpringHill Suites® failed to take appropriate action to prevent the trafficking of individuals for sex so that Marriott and SpringHill Suites® could continue to profit from the business that trafficking brings, including business from out-of-state.

e. Defendant Marriott should have known of sex trafficking occurring on its branded hotel properties. Marriott and SpringHill Suites® knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex

trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Marriott and SpringHill Suites® knew that all of this violent and criminal activity was occurring at their branded properties therefore they knew that sex trafficking was occurring at their branded properties. Yet Marriott and SpringHill Suites® allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the SpringHill Suites®. Marriott and SpringHill Suites® facilitated the trafficking through its practices, policies, and procedures. Marriott and SpringHill Suites® failed to take appropriate action to prevent the trafficking of individuals for sex so that Marriott and SpringHill Suites® could continue to profit from the business that trafficking brings, including business from out-of-state.

f.  Marriott knew or should have known that the SpringHill Suites® hotel where Plaintiff A.D. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff A.D. was trafficked.

g.  Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Marriott has

repeatedly failed to stop these actions.

h. Marriott was in an agency relationship with SpringHill Suites® branded hotel offering public lodging services in the hotel. This agency relationship was created through Defendant Marriott's exercise of an ongoing and systemic right of control over SpringHill Suites® hotel by Defendant Marriott's operations, including the means and methods of how SpringHill Suites® branded hotel conducted daily business through one or more of the following actions:

    i. providing or requiring the software, hardware, and platforms where suspicious activity or other concerns could be addressed with the Brand;

    ii. providing reservation platforms where payment modes, guest names, or travel habits or history, and suspicious reservations would suggest trafficking;

    iii. providing new hire orientation on human rights and corporate responsibility;

    iv. providing training and education to SpringHill Suites® branded hotels through webinars, seminars, conferences, and online portals;

v.    providing and controlling customer review and response platforms;

vi.    hosting online bookings on Defendant Marriott's domain;

vii.    requiring SpringHill Suites® branded hotels to use Defendant Marriott's customer rewards program;

viii.    requiring SpringHill Suites® branded hotels to use Defendant Marriott's property management software;

ix.    requiring SpringHill Suites® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

x.    providing IT support for all property management systems, owned, operated and required by Marriott;

xi.    setting employee wages;

xii.    making employment decisions;

xiii.    advertising for employment;

xiv.    sharing profits;

xv.    requiring SpringHill Suites® branded hotels to use Defendant Marriott's property management software;

xvi.    requiring SpringHill Suites® branded hotels to use approved vendors for internet services or other

requirements for Wi-Fi access and filtering;

xvii. providing IT support for all property management systems, owned, operated and required by Marriott;

xviii. standardized training methods for employees;

xix. building and maintaining the facility in a manner specified by the owner;

xx. standardized or strict rules of operation;

xxi. regular inspection of the facility and operation by owner;

xxii. fixing prices; or

xxiii. other actions that deprive SpringHill Suites® branded hotels of independence in business operations.

i. Upon information and belief, Defendant Marriott could, and in many instances did, track and control data regarding guest preferences and other information, including physical location of guests via their internet enabled devices, guest internet activity via their Wi-Fi services, and inventory information at each branded location. All of this data information was under Defendant Marriott's management and control and included all of the indicia of A.D.'s trafficking. This data included the details of A.D.'s check-in, the internet activity associated with her reservation, including

access to Backpage.com to post advertisements from the hotel, access to other online websites known for sexual exploitations, her location at the hotel which included the notable fact that she rarely, if ever, left the hotel despite extended stays, increased use of data due to in-room live video monitoring by her trafficker who frequently sat in the hotel lobby to book additional dates, and the spike in requests for towels and other items from inventory.

j.  An apparent agency also exists between Defendant Marriott and SpringHill Suites® hotel. Defendant Marriott held out SpringHill Suites® branded hotels to the public as possessing authority to act on its behalf. Defendant Marriott clothed the SpringHill Suites® with apparent authority to act for Defendant Marriott in the following ways: by requiring the use of Marriott signs, providing Marriott branded stationery, requiring the use of Marriott's website and Marriott's mandated 1-800 toll-free number for guest reservations, and requiring the implementation of Marriott guest rewards programs. On information and belief, Defendant Marriott's conduct reasonably led A.D.'s perpetrator to believe that the SpringHill Suites® had the authority it purported to have, and A.D. was injured as a result.

k.  Given Defendant Marriott's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including SpringHill Suites® branded hotels, Defendant Marriott breached its duties in the following ways:

   i.  did not adequately distribute information to assist employees in identifying human trafficking;

   ii.  failed to mandate a process for escalating human trafficking concerns within the organization;

   iii.  failed to mandate managers, employees, or owners attend training related to human trafficking;

   iv.  failed to provide new hire orientation on human rights and corporate responsibility;

   v.  failed to provide any or adequate training and education on human trafficking through webinars, seminars, conferences, and online portals;

   vi.  failed to develop and hold or require ongoing training sessions on human trafficking; or

   vii.  failed to provide or mandate checklists, escalation protocols and information to property management staff

or tracking performance indicators and key metrics on human trafficking prevention;

viii. failed to evaluate universal reservation systems for suspicious booking activities;

ix. failed to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

x. failed to ban cash or prepaid credit cards as payment; and

xi. failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com and Craigslist.com, from being accessed via hotel internet service.

l.  Upon information and belief, Defendant Marriott requires its hotels to carry a certain level of Wi-Fi internet access for hotel guests, through vendors that Defendant Marriott specifies and requires.[7]

m. Upon information and belief, Defendant Marriott requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, including those that give Defendant Marriott access to the

---

[7] See https://blueportwireless.com/gpns-certified/ ("On May 22, 2013, Blueport Wireless becomes the first vendor to be certified in the 2013 Marriott Global Property Network Standard."); *see also* https://www.deepbluecommunications.com/industries/hotel-wifi/marriott/ ("Deep Blue has been a Marriott GPNS Certified Hotel WiFi Vendor since 2011.").

internet data.

n.  Defendant Marriott states in its privacy policy that it collects the following categories of information from hotel guests: contact information such as name, gender, postal address, telephone number, email address; financial information such as credit and debit card number or other payment data; date and place of birth; membership or loyalty program data; social media account IDs, profile photos or data made available by linking social media and loyalty accounts; biometric data; images and video and audio data via security cameras in public areas and body-worn cameras carried by loss prevention officers and other security personnel; and other technological data including a customer's browser or device, data collected when downloading or using an app; cookies that collect data such as time spent on online services, pages visited, and IP addresses.[8]

o.  Defendant Marriott retains and can view internet access, which may include DNS logs, IP addresses, temporary internet files or other logs reflecting wireless internet access to its hotel properties,

---

[8] *See* Marriott International, Inc.'s Privacy Policy, *available at* https://www.marriott.com/about/privacy.mi#data-covered

including the type of monitoring described above.

p.  Marriott's centralized property management system[9] also gains Marriott access to hotels guest information registration, including names, date of booking, and length of stay.

q.  Upon information and belief, Defendant Marriott can therefore see unusual or suspicious bookings, for instance, when clientele at its branded hotels is disproportionately male for same-day bookings for one-night stays, when bookings rotate somewhat uniformly throughout its branded properties, or when reservations for extended stays are requested.

r.  Upon information and belief, Defendant Marriott has the capacity to monitor and control branded property hotel guests' access through hotel Wi-Fi to certain websites.[10]

s.  Upon information and belief, Defendant Marriott can see when branded property hotel guests are accessing sex buyer

---

[9] *See, e.g.*, Marriott International Selects Cloud-based MICROS OPERA as Its Next-Generation Property Management System for all North America Properties, *available at* https://www.prnewswire.com/news-releases/marriott-international-selects-cloud-based-micros-opera-as-its-next-generation-property-management-system-for-all-north-america-properties-204731811.html

[10] *See* Marriott to Pay $600,000 to Resolve Wi-Fi Blocking Investigation, *available at* https://assets.documentcloud.org/documents/1308852/doc-329743a1.pdf; *see also, e.g.*, https://traveltips.usatoday.com/hotels-track-internet-usage-111659.html ("the hotel's server usually has a log file that lists every connection the server makes for its users while they browse using its network.").

advertisements and websites through hotel Wi-Fi, including Plaintiff's advertisements on Backpage.com.

t.  Upon information and belief, and contrary to ECPAT best practices, Defendant Marriott failed to block or otherwise limit access to sex buyer advertisements and websites through Wi-Fi.

u.  Upon information and belief, Defendant Marriott's ability to see disproportionately male clientele registering for short hotel stays while accessing backpage.com and other sex buyer advertisements and websites extended to the SpringHill Suites® hotel where Plaintiff was trafficked for sex.

v.  Despite access to information comprising clear sex trafficking indicators, Defendant Marriott continued to permit and profit from male clientele who rented hotel rooms to buy sex, including those who bought Plaintiff.

w.  Upon information and belief, Defendant Marriott monitors and reviews reports of criminal activity, including through online reviews, at its branded properties.

x.  Upon information and belief, Defendant Marriott provides a platform for brand employees to report, at their discretion, to the Brand suspicious activity occurring at their branded hotel.

Defendant Marriott controls and houses this collective data from all branded properties.

y.  Thus, for several years, Defendant Marriott has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its SpringHill Suites® branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff A.D. at SpringHill Suites® hotel that forms the basis of this complaint. For example:

   i.  In Oak Creek, WI,  "[a]ccording to police reports, an employee from the Fairfield Inn called the police, saying that several men were entering and leaving a room in the building, and suspected there might be a prostitution operation taking place inside."[11]

   ii.  In Fairview Township, PA, "[t]he woman, later identified as Dowdell, agreed to meet an undercover detective at the Fairfield Inn and Suites. When Dowdell arrived at the room, she looked around the entire interior and then asked

---

[11] *Prostitution Operation Busted at Fairfield Inn: Report*,  PATCH MEDIA (Mar. 31, 2018) *available at* https://patch.com/wisconsin/oakcreek/prostitution-operation-busted-fairfield-inn-report

the detective for $180. The detective gave her $200, and she hugged him and patted him down."[12]

iii.   In Newnan, GA, "[a] two-day prostitution sting conducted at the SpringHill Suites by Marriott (1119 Bullsboro Dr), resulted in a victim of human trafficking being rescued."[13]

iv.   In St. Paul, WI, – "[a]ccording to the criminal complaint, Christner knew about Christoff because he hired her as a prostitute. She met Christoff at the SpringHill Suites at 472 Jackson St. in St. Paul on Aug. 28."[14]

v.   In Chicago, IL, "Lavarius McFadden used a messaging app to set up a meeting with Elizabeth Long at the SpringHill Suites by Marriott on March 14, but claimed he was unaware that she was a prostitute, Assistant State's Attorney James Murphy said during a bond hearing at the

[12] *Wrightsville man, two women busted for prostitution,* YORK DAILY RECORD (Oct. 18, 2016) *available at* https://www.ydr.com/story/news/crime/2016/10/18/more-alleged-prostitutes-busted-hotels-cops-say/92352000/

[13] *21 charged with prostitution, pimping after two-day sting at Newnan SpringHill Suites* THE GEORGIA GAZETTE (June 25, 2020) *available at* https://thegeorgiagazette.com/coweta/21-charged-with-prostitution-pimping-after-two-day-sting-at-newnan-springhill-suites/

[14] *2 more charged with murder in downtown St. Paul hotel shooting of prostitute's customer,* TWINCITIES PIONEER PRESS.COM (Nov. 4, 2021) *available at* https://www.twincities.com/2021/11/04/two-more-charged-in-fatal-springhill-suites-shooting-charges-say-a-prostitute-targeted-st-paul-man-for-robbery/

Leighton Criminal Courthouse."[15]

vi.   In March of 2011, a New Hampshire sportswriter was arrested for running a prostitution ring from advertisements on craigslist, charging clients $240 an hour. Employees at the SpringHill Suites in Andover, New Hampshire contacted the police about the man, resulting in the police conducting a sting at their hotel.[16]

vii.  In April of 2012, a woman sued a Marriott Hotel in Boston, Massachusetts after a man responded to a craigslist advertisement soliciting sex and killed her daughter within the hotel in a violent attack. The woman said hotels should be doing more to curb prostitution.[17]

viii. In June of 2012 a Professor from the University of Georgia was arrested at a SpringHill Suites in Athens, Georgia after

---

[15] *Man held without bond for allegedly murdering sex worker at River North hotel* CHICAGO SUN TIMES (Apr. 27, 2020) available at https://chicago.suntimes.com/crime/2020/4/27/21238813/lavarius-mcfadden-first-degree-murder-springhill-suites-river-north-dearborn-street-chicago

[16] Caparell, Adam, Award-winning journalist sentenced to prison for running prostitution ring in New England hotel room (Mar. 22, 2011), available at https://www.nydailynews.com/news/national/award-winning-journalist-sentenced-prison-running-prostitution-ring-new-england-hotel-room-article-1.120186

[17] Mother of Craigslist victim sues Marriott, THE BOSTON GLOBE (Apr. 2012), available at https://www3.bostonglobe.com/metro/2012/04/13/mother-woman-slain-craigslist-killer-sues-marriott-hotel-chain/LxuP2jZtY59DsxMTZXJ09H/story.html?arc404=true

police discovered he had been purchasing sex from online advertisements. The man responded to an ad posted by an undercover police officer and was taken into custody when he arrived at the hotel.[18]

z.  Additionally, Defendant Marriott has been aware of sex trafficking and guest safety issues on SpringHill Suites® brand properties through publicly available websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking and guest safety issues on SpringHill Suites® brand properties and Defendant Marriott's inattentiveness, for example:

    i.  In November of 2021, a reviewer described staff at the Fairfield Inn and Suites in Naples as "rude and uninformed," indicating that the back entrance door stayed open at all times, that safety measures were ignored, and that staff remained indifferent to guest safety and questions.[19]

    ii.  In May of 2021, a reviewer brought attention to a safety

---

[18] https://www.ajc.com/news/local/uga-academic-charged-prostitution-sting/KLzLbi9mrZJviLBnuGJIDM/

[19] Review of Fairfield Inn and Suites by Marriott Naples (Nov. 1, 2021), available at https://www.booking.com/hotel/us/fairfield-inn-and-suites-by-marriott-naples-two.html#tab-reviews

issue at the Fairfield Inn and Suites in Naples: "side door lock wasn't operational so basically anyone could access to (sic) the hotel."[20]

iii.  In June of 2021, a reviewer mentioned that during their stay, their vehicle was broken into. The police officer told the reviewer that due to poor guest safety measures and lack of security, the hotel was a "prime target for smash and grab thieves" and that the security door at the far end of the hotel would not latch, allowing anyone to come into the hotel.[21]

aa. Upon information and belief, Defendant Marriott monitors customer reviews and complaints for all brand properties.

bb. Upon information and belief, the branded properties depend on Defendant Marriott for notification of negative customer reviews.

cc. Upon information and belief, Defendant Marriott, not the branded properties, house and control the data regarding customer reviews.

---

[20] Review of Fairfield Inn and Suites by Marriott Naples (May 27, 2021), available at https://www.booking.com/hotel/us/fairfield-inn-and-suites-by-marriott-naples-two.html#tab-reviews.
[21] Review of Fairfield Inn and Suites by Marriott Naples (Jun. 21, 2021), available at https://www.expedia.com/Naples-Hotels-Fairfield-Inn-Suites-By-Marriott-Naples.h2733223.Hotel-Information?pwaDialog=reviews-property-reviews-1

**C.**     **THE SEX TRAFFICKING OF A.D. AT SPRINGHILL SUITES**

32.    One of the lives devalued and otherwise adversely affected by the hospitality industry's inattention to the prevention and eradication of sex trafficking was that of A.D.

33.    In November of 2011, A.D. met a man who she was interested in ("hereinafter referred to as "Trafficker 2"). He took advantage of her innocence and forced her into a sexual encounter. Trafficker 2 subsequently courted her and manipulated her into thinking they were in love. While "dating," Trafficker 2 would manipulate A.D. into numerous non-consensual sexual encounters; forced her to take drugs; and take the blame for his criminal acts. Trafficker 2 would consistently take advantage of A.D. and would soon traffick her in hotels throughout Central Florida.

34.    After months of "dating," Trafficker 2 suggested A.D. move in together. Because he was a convicted felon and registered sex offender, he forced A.D. to enter into a lease agreement. In order to make money to sustain their life together, Trafficker 2 suggested A.D. work to make extra money.

35.    Under the ruse of a modeling job advertised on Backpage.com, Trafficker 2 forced A.D. to work. During her "interview" for the modeling job at a hotel, A.D. met a man (hereinafter referred to as "Trafficker 1") who raped her into submission.

36.     While victimized by her traffickers, A.D. was subjected to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at the Defendants' hotel property in approximately July of 2012.

37.     Plaintiff A.D. was first subjugated to trafficking at SpringHill Suites® by Marriott located at 3798 White Lake Blvd, Naples, FL 34117, in approximately July of 2012.

38.     Trafficker 2 advertised A.D. on Backpage.com, which would include the intersection on which the hotel was located.

39.     At the SpringHill Suites, Trafficker 2 advertised A.D. on Backpage.com for massages only. At the SpringHill Suites, they were able to dim the lights to set the mood as massage parlor. Trafficker 2 charged $150 dollars for a 60-minute massage.

40.     The SpringHill Suites would let them pay for the room with cash, but required a credit card for the room deposit.

41.     At the direction of her trafficker, A.D. used her identification to book the rooms and check in.

42.     A.D. was trafficked at the SpringHill Suites® by Marriott at a minimum 5 times a month for approximately 2 nights each stay. Up to 8 to 15 sex buyers per stay arriving at the SpringHill Suites® by Marriott rooms rented for the purpose

of sell A.D. for sex. A.D. was sexually exploited and abused numerous times at the SpringHill Suites® by Marriott.

43.     Through hotel staff and employees, Defendants knew or should have known that A.D. was being trafficked for sex due to several well-known red flags, including but not limited to:

      a.  Large amounts of used condoms, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

      b.  Payments for the rooms in cash, or cash substitutes such as a prepaid credit card;

      c.  A.D.'s physical appearance (malnourished, bruised, beaten, drugged, and inappropriate attire);

      d.  A continuous procession of men entering and leaving A.D.'s room;

      e.  Excessive requests for sheets, cleaning supplies, towels, and room service;

      f.   The personal relationship between various hotel staff and A.D.'s trafficker; and

      g.  The direct employee encounters with A.D. and her trafficker inside the SpringHill Suites® by Marriott.

**F.  THE DEFENDANTS FACILITATED THE TRAFFICKING OF A.D.**

44.    Defendants profited from the sex trafficking of A.D. and knowingly or negligently aided, enabled, and facilitated the sex trafficking of A.D. The Defendants leased rooms to A.D.'s traffickers when they knew, or should have known, that her trafficker was using their room to subject A.D. to repeated exploitation as he forced her into sexual servitude.

45.    Defendants knew, or should have known, that A.D. was being trafficked and that the Defendants were knowingly benefiting financially from said exploitation, because A.D.'s trafficker frequented the Defendants' hotel.

46.    Defendants knew, or should have known, that A.D. was being trafficked because A.D. constantly entertained traffic to appease her traffickers' daily quotas and their behavior indicated they were using the Defendants' hotel for his illegal sex trafficking activities.

47.    Defendants actively participated in this illegal endeavor by knowingly or negligently providing lodging in which to harbor A.D. while he was trafficking her.

48.    Defendants profited from the sex trafficking of A.D. and knowingly or negligently aided and participated with A.D.'s trafficker with his criminal activity. The Defendants took no action as A.D. repeatedly visited the hotel, often with different guests, avoiding eye contact, and dressing inappropriately for the weather.

49.     The Defendants all had the opportunity to stop A.D.'s trafficker and offenders like him from victimizing A.D. and others like her. Instead, every Defendant failed to take reasonable measures to stop sex trafficking from occurring in their hotel.

50.     The Defendants all financially benefited from the sex trafficking of A.D., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

51.     Defendants benefit from the steady stream of income that sex traffickers bring to their hotel brands.

52.     Defendants financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

53.     Defendants have long been aware that free Wi-Fi is attractive to traffickers yet failed to provide adequate security to protect Plaintiff, including adequate measures to monitor Wi-Fi access. The myriad types of electronically stored information ("ESI") generated in the use of a Wi-Fi network can manage and track communications and activity originating from devices granted access. By way of the ESI generated through the use of Defendants' Wi-Fi networks, Defendants had information in their custody, control, and possession that enabled them to identify the purpose for which their Wi-Fi network and their property were being used and by which they profited.

54.    Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties despite assurances to the public, guests, and other stakeholders that they were taking these steps.

55.    Defendants maintained their deficiencies to maximize profits by:

   a. Reducing the cost of training employees and managers on how to spot the signs of human trafficking and sexual exploitation and what steps to take;

   b. Lowering operating costs and management costs by not analyzing the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the issues at relevant locations or else hold the franchisee accountable and terminate their franchise agreement;

   c. Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotel;

   d. Not refusing room rentals, or reporting guests to law enforcement,

in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e.  Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation.

56.    As a direct and proximate result of these egregious practices on the part of the Defendant Hotel, A.D. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CAUSES OF ACTION
### A.    COUNT ONE – 18 U.S.C §1595 ("TVPRA")
**(Against all Defendants)**

57.    The Plaintiff A.D. incorporates each foregoing allegation.

58.    A.D. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

59.    The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of

18 U.S.C. §1591 (a). At all relevant times, the Defendants breached this duty by participating in a venture which facilitated the harboring and providing of A.D. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

60.    The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade. Moreover, the Defendants directly benefited from the trafficking of A.D. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotel. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of A.D.'s injuries and damages.

61.    A.D. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotel and property in violation of 18 U.S.C. §1591(a).

## PRAYER FOR RELIEF

WHEREFORE the Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, separately and severally, and that it award damages to her in an amount which will adequately compensate her for the injuries and damages she sustained due to the Defendants' conduct outlined as follows:

a. All available compensatory damages for the described losses with respect to each cause of action;

b. past and future medical expenses, as well as the costs associated with past and future life care;

    a. past and future emotional distress;

    b. consequential and/or special damages;

    c. all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

    d. disgorgement of profits obtained through unjust enrichment;

    e. restitution;

    f. punitive damages with respect to each cause of action;

    g. reasonable and recoverable attorneys' fees;

    h. costs of this action; and

    i. pre-judgment and all other interest recoverable

Also, on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendants, and that it award damages to the Plaintiff in an amount which adequately reflects the enormity of the Defendants' wrongs, and which will effectively prevent other similarly caused acts. Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other

damages and equitable relief the Court or jury deems appropriate under the circumstances.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY**

Dated: October 11, 2022                    **RESPECTFULLY SUBMITTED,**

*/s/ Kathryn L. Avila*
**Kathryn L. Avila** (Fla. Bar No. 1019574)
**Emmie J. Paulos** (Fla. Bar No. 99010)
LEVIN PAPANTONIO RAFFERTY
316 S. Baylen St. Suite 600
Pensacola, Florida 32502
T: 850-436-6246
F: 850-436-6271
E: kavila@levinlaw.com / epaulos@levinlaw.com

***Attorneys for Plaintiff***